IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Dwayne M. Blakely, ) | |
| ) | Civil Action No. 6:06-2397-RBH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on September 3, 2002, respectively, alleging that he became unable to work on June 24, 2002. The applications were denied initially and on reconsideration by the Social Security Administration. On July 3, 2003, the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge, before whom the plaintiff, his attorney and a vocational expert appeared on March 28, 2005, considered the case *de novo*, and on April 14, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 26, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant met the disability insured status requirements of the Act on June 24, 2002, the alleged date of disability onset, and continues to meet them through the date of this decision.
>
> (2)    The claimant has not engaged in substantial gainful activity since his alleged onset date.
>
> (3)    The medical evidence establishes that the claimant has "severe" degenerative joint disease, seizure disorder, panic disorder, depression, and obesity, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4.
>
> (4)    For reasons explained in the body of this decision, the testimony regarding the severity of the claimant's impairments and resulting functional limitations was not persuasive.
>
> (5)    The claimant retains the residual functional capacity to perform "light" work with the following additional exertional and non-exertional limitations: no frequent climbing or balancing, no exposure to unprotected heights or hazardous machinery, no repetitive reaching above shoulder level with the right arm, a sit/stand option which would allow him to shift positions at least once per hour, limited interaction with large numbers of co-workers or the general public, dealing with things rather than people, and no "skilled" work.
>
> (6)    The claimant is unable to perform his past relevant work.
>
> (7)    The claimant is a "younger individual," and he has a high school education.

>    (8)     Based on an exertional capacity for "light" work, and the claimant's age, education, and work experience. section 404.1569 and Rule 202.21, Table No. 2, Appendix 2. Subpart P, Regulations No. 4 would direct a conclusion of "not disabled".
>
>    (9)      Although the claimant is unable to perform the full range of "light" work, he is capable of making the adjustment to work which exists in significant numbers in the national economy. Such work includes employment as an ink printer or nuts and bolts assembler.  A finding of "not" disabled is therefore reached within the framework of the above cited rule.
>
>    (10)   Although the claimant has a history of alcohol abuse, drug abuse and alcoholism are not material factors in the determination of disability.
>
>    (11)   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision 20 CFR 404.1520(f).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the

Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 40 years old on the date of the ALJ's decision (Tr. 54). He has a high school education and has worked as a weaver, doffer, warehouse worker, sweeper, and stone worker (Tr. 349-55).

*Medical Evidence Before the Administrative Law Judge*

The record reveals the plaintiff sought treatment for depression and anxiety at Catawba Community Mental Health Center in May 2000. The plaintiff denied any previous history of mental health treatment. He related that his anxiety symptoms began in 1997 and worsened after his wife's death in 1998, and that he had not worked steadily since his wife's death (Tr. 243-46). In January 2001, a diagnosis of adjustment disorder

and a GAF code of 70[2] were noted, and short-term counseling was recommended. The plaintiff's case was closed on January 17, 2001, due to noncompliance (Tr. 250-52).

From January 1993 to January 2001, the plaintiff was treated at Lowrys Family Medicine for various conditions, including a seizure disorder, chest pain, back strain, tension headaches, hypertension, gout, anxiety and depression, and noninsulin dependent diabetes mellitus (Tr. 168-225). The plaintiff was first treated for a seizure disorder in January 1999 (Tr. 175). A CT scan of the brain and EEG were reported as normal, and as of January 2001, the plaintiff had had no seizures since August 27, 2000 (Tr. 176,188-90). His chest pain was diagnosed as costochondritis in August 2000 (Tr. 184). In October 2000, an EKG showed normal sinus rhythm with tachycardia, and no evidence of ischemia (Tr. 187); the results of a stress test in December 2000 were negative (Tr. 190). With regard to back pain, x-rays of the plaintiff's lumbar spine, taken in September 2000 showed mild spondylitic changes and no acute abnormalities (Tr. 223). As of January 3, 2001, the plaintiff was receiving vocational rehabilitation services and looking for work (Tr. 190). He was terminated as a patient at Lowrys Family Medicine on January 29, 2001, due to his "interaction with our office staff" (Tr. 192).

The plaintiff commenced treatment at Great Falls Clinic on April 3, 2001. In April and June 2001, he was treated with medication for complaints of continuous right hip pain, diabetes, hypertension, and seizure disorder. In February, April, and June of 2001, the plaintiff complained of pain in the right hip, leg, and shoulder (Tr. 273-75).

On June 1, 2001, the plaintiff was treated with medication at Chester County Hospital for right hip pain. X-rays showed "what "appear[ed] to be changes of early

---

[2]A Global Assessment of Functioning (GAF) code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 32 (4th ed. 1994).

6

avascular necrosis," and an impression of "[question of] avascular necrosis" was noted. Further evaluation by MRI scan was recommended. The treating physician issued the plaintiff a "Certificate to Return to Work or School," indicating he could return to work as of June 10, 2001 (Tr. 280-84).

In an appointment at the Great Falls Clinic on July 23, 2001, the plaintiff stated he no longer had right hip pain and that he was ready to return to work. The treating physician documented a full range of motion. The plaintiff was referred for orthopedic evaluation in April 2002, but failed to keep the appointment (Tr. 274-75).

The plaintiff returned to Catawba Community Mental Health Center on June 26, 2002, complaining of depression since his wife's death. He related that he had been fired from his job for excessive absences related to depression, and stated that he had lost a previous job due to hip pain. He was diagnosed with an adjustment disorder and a GAF code of 65, and was referred for vocational rehabilitation (Tr. 253).

In September 2002, Dr. Carlton Gay prescribed Zoloft for depression and Trazodone for insomnia. Dr. Gay stated that the plaintiff met the criteria for dysthymia and panic disorder, but had a "very high suspicion of disability seeking" given that the plaintiff had not sought medical treatment for reported pain/problems. Dr. Gay cautioned others "to be very mindful of possible secondary gain issues." Dr. Gay also noted that the plaintiff had "finally" contacted the department of vocational rehabilitation, and that he had no complaints of depression since his parents were helping with his bills. Dr. Gay again noted that the plaintiff "continues to be disability seeking" and cautioned staff to "be mindful of secondary gain." In December 2002, the plaintiff "continued to focus on disability seeking" and "seemed to have no investment in wanting to look at what abilities he does have" (Tr. 262-65).

On November 18, 2002, Dr. Vicky E. Kerr evaluated the plaintiff at the request of the Commissioner. The plaintiff stated that he felt disabled because his leg gave out at

7

times and his arm hurt constantly, and because his seizures "stop[ped] him from doing any job." Dr. Kerr found the plaintiff had normal pulses; no muscle wasting; well-controlled blood pressure; decreased range of motion of the neck (possibly due to cervical radiculopathy); limited range of motion and profound weakness in the right upper extremity; decreased range of motion in the right hip; and decreased sensation in both forearms. She reported diagnoses of degenerative joint disease, neuromuscular weakness, anxiety and depression, seizures, hypertension, musculoskeletal pain, and tension headaches (Tr. 286-91).

On December 3, 2002, Craig A. Horn, Ph.D., completed a Psychiatric Review Technique Form concerning the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Horn found that the plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, and no episodes of deterioration of extended duration (Tr. 112-25). In a mental residual functional capacity ("RFC") assessment completed on the same date, Dr. Horn reported that the plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions; and interacting appropriately with the general public (Tr. 126-28).

Dr. Joyce B. Lewis, a State agency physician, assessed the plaintiff's physical RFC on December 11, 2002, and found that he could perform light work, subject to postural limitations (Tr. 130-37). Dr. James H. Weston, another State agency physician, reached the same conclusion on April 24, 2003 (Tr. 140).

The plaintiff continued to receive treatment for dysthymia and panic disorder at Catawba Community Mental Health Center from May 2003 to December 2004 (Tr. 305-20). On May 6, 2003, he reported that he had been using a walker for three months, that he felt "more comfortable overall" on Zoloft, but complained of at least one panic attack per

day, especially in public places (Tr. 305).  In July 2003, Dr. Gay encouraged the plaintiff to be more active and add structure to his day.  Dr. Gay also cautioned others to "be aware of secondary gain" (Tr. 307).  In August 2003, the plaintiff was again referred to the department of vocational rehabilitation to "assess [his] ability to return to competitive employment" (Tr. 310).  In September 2003, Dr. Gay noted that the plaintiff would probably not "reach substantial benefit until disability case reaches closure" (Tr. 310).

On March 3, 2004, Dr. Gay noted that the plaintiff said he was "a little better in some areas - sleep mood is definitely better overall" (Tr. 311).  On May 25, 2004, Dr. Gay noted that the plaintiff reported he thought he might be a little worse, but that it was difficult to determine whether his lack of improvement was "reality based" or related to "secondary gain" given that he was seeking disability (Tr. 314-315).  On August 23, 2004, Dr. Gay noted that the plaintiff reported that "[e]verything is on hold until I get my disability. I'll be stuck if I don't get it. I have to get it to have a future. . . . My lawyer says hopefully everything will be settled soon. It will be 14 months since my appeal. I need to get it so I can get my leg and back fixed, get some computer training and maybe get a job." (Tr. 316).  In December 2004, Dr. Gay discouraged the plaintiff from devoting all of his time and energy to the pursuit of disability benefits (Tr. 320).

From January 7, 2003, to February 5, 2005, medication was prescribed for the plaintiff at Good Samaritan Medical Clinic for complaints of pain in the right hip and leg, lower back pain, panic attacks, seizure disorder, and hypertension (Tr. 292-303).

Andrew B. McGarity, Ph.D., evaluated the plaintiff at the request of the Commissioner on June 3, 2003.  The plaintiff related that he was having two to three seizures per month and three panic attacks per day.  He complained of a sleep disorder, auditory hallucinations, and crying spells.  Dr. McGarity noted the plaintiff used a walker and complained about his physical ailments.  He found the plaintiff was vague in describing his symptoms and "did not appear to be overly depressed by any means."  He found the

9

plaintiff had "appropriate" concentration, fair insight and judgment, good short-term recall, and average intelligence. Dr. McGarity reported diagnoses of panic disorder, personality disorder, report of seizure disorder, and a GAF of 60 (Tr. 276-79).

On June 19, 2003, Renuka R. Harper, Ph.D., completed a Psychiatric Review Technique Form concerning the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Harper found the plaintiff had moderate limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, and no episodes of deterioration of extended duration (Tr. 142-55).

*Hearing Testimony*

At the hearing on March 28, 2005, the plaintiff testified that he had applied for vocational rehabilitation services, but was told there was nothing they could do for him (Tr. 349). He testified that he worked as a weaver in a plant until June 2002, which involved 11 hours of standing during 12-hour shifts (Tr. 350-51). He testified that he was disabled by constant pain in his back, right shoulder, right arm, and right leg; and panic attacks (Tr. 355-56). He stated that he experienced give-away weakness in his right leg, and numbness in his hands, fingers, leg, and foot (Tr. 357). He stated that he had been using a cane for approximately three years, and that he used a walker at home (Tr. 358-60). He testified that he suffered panic attacks three or four times per day that lasted approximately 45 minutes (Tr. 361). He testified that he had crying spells every other day, and that his medications caused drowsiness, dizziness, and blurred vision (Tr. 362). He testified that he had seizures "two or three times every other week" during sleep, and that he had difficulty sleeping due to pain and racing thoughts (Tr. 363-65, 372-73). He stated that he could sit for 15 to 20 minutes, and that he could stand for only five to seven minutes without a cane (Tr. 365-66). He also stated that his pain, depression, and social anxiety had worsened since 2002 (Tr. 369).

The ALJ asked Lena Hollenbeck, M.S., a vocational expert, to consider a person of the plaintiff's age, education, and work experience who could perform unskilled or semiskilled sedentary and light work with the following limitations: no frequent climbing, balancing, or exposure to unprotected heights; no repetitive reaching above shoulder level with the right upper extremity; limited interaction with large numbers of co-workers or the general public; and a need to alternate sitting and standing at least once an hour. Ms. Hollenbeck testified that such a person could perform the sedentary, unskilled jobs of surveillance system monitor and ink printer, and the unskilled light jobs of nut-and-bolt assembler and mail clerk (Tr. 377-78).

***Medical Evidence Submitted to the Appeals Council***

On August 6, 2005, in responses to a questionnaire, Dr. Sam Stone indicated that the plaintiff would have to rest longer than one hour during an eight-hour workday, and would be absent from work more than three days per month due to chronic lower back pain, recent pancreatitis, depression, and seizures. Dr. Stone also indicated that the plaintiff could not engage in sedentary work on a full-time basis (Tr. 330).

On March 4, 2005, a therapist at Catawba noted that the plaintiff had been compliant with medication and doctor appointments, but remained resistant to using vocational rehabilitation and had not yet followed through with a complete evaluation (Tr. 331).

On May 31, 2005, the plaintiff complained to Dr. Carlson that he was having panic attacks every two to three hours and that he was unable to go to the grocery store unless it was almost empty (Tr. 331).

On May 3, 2005, the plaintiff presented at Good Samaritan Medical Clinic with complaints of back pain, cramps in the side when bending over, pain in multiple joints, and

frequent headaches. On July 5, 2005, it was noted that the plaintiff complained of pain in the right leg and hip, and had recently sought emergency-room treatment for back pain (Tr. 336).

## ANALYSIS

The plaintiff alleges disability commencing June 24, 2002, as a result of pain in his right leg and right arm, seizures, high blood pressure, panic disorder, and depression. The plaintiff was 40 years old on the date of the ALJ's decision. The ALJ found that the plaintiff had the RFC to perform light work with no frequent climbing or balancing, no exposure to unprotected heights or hazardous machinery, no repetitive reaching above shoulder level with the right arm, a sit/stand option which would allow him to shift positions at least once per hour, limited interaction with large numbers or co-workers or the general public, dealing with things rather than people, and no "skilled" work (Tr. 29).

The plaintiff argues that the ALJ erred by (1) failing to consider the effects on his RFC of avascular necrosis and a cervical lesion and thus failing to consider his impairments in combination; (2) failing to properly consider his credibility; (3) failing to properly assess his RFC; (4) failing to include all of his limitations in the hypothetical question to the vocational expert; and (5) considering jobs identified by the vocational expert that exceeded his RFC. The plaintiff further contends that the Appeals Council's failure to make specific findings regarding new evidence is reversible error.

### *Avascular Necrosis and Cervical Lesion*

The plaintiff argues that the ALJ erred by failing to consider the effects of avascular necrosis and a cervical lesion in determining his RFC. The Commissioner contends that the plaintiff's argument is without merit since the ALJ's assessment accommodated the plaintiff's back and hip pain, and as there was no definitive diagnosis

12

of avascular necrosis. On June 1, 2001, the plaintiff was treated with medication at Chester County Hospital for right hip pain. X-rays showed "what "appear[ed] to be changes of early avascular necrosis," and an impression of "[question of] avascular necrosis" was noted. Further evaluation by MRI scan was recommended (Tr. 283). Dr. Kerr saw the plaintiff for a consultative evaluation at the request of the Administration. She noted that he needed assistance in rising from a lying to a sitting position on the exam table, and needed to hold the table to squat. He had marked right upper extremity weakness, he limped on the right, and he was unable to walk on his right heel. The plaintiff had decreased sharp sensation in the radial area of his forearm bilaterally that appeared to be symmetrical, which was indicative of a cervical lesion in the C7-8 area. Her diagnoses included degenerative joint disease and neuromotor weakness. Dr. Kerr said that the plaintiff definitely had some degenerative joint disease as evidenced by decreased range of motion in his neck and definite problems with his hip range of motion. He had profound weakness in his right upper extremity which was probably due to cervical radiculopathy, cervical spine stenosis, or herniated disc, and which needed to be evaluated further as the plaintiff could lose his neuromotor function (Tr. 290).

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Upon remand, the ALJ should develop the record with regard to the evidence that the plaintiff suffered from avascular necrosis in the right hip and a cervical lesion. He should then consider the plaintiff's impairments in combination as set forth above in determining the cumulative effect of the impairments on the plaintiff's ability to work.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly consider his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear

14

to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1) the individual's daily activities;
>
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3) factors that precipitate and aggravate the symptoms;
>
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's credibility:

> The claimant's testimony was credible to the extent that he can no longer perform the heavy lifting and other strenuous activities required of his past work but not to the extent that he is "disabled" as defined by the Regulations. The medical evidence shows little change in the claimant's condition before and after his alleged date of disability onset. He was able to work for several years while reporting the same complaints. None of the medical reports contained in the record contain complaints of symptoms to the extent alleged by the claimant. For example, his testimony concerning the side effects of his medication is not supported by his statements to his treating physicians. The treatment records show that his medications were effective but that he could not always afford them

> (Exhibits 2F, 3F, 8F, 9F). The claimant has not always been compliant with his anti-seizure medication regimen, but he told his doctor in January 2005 that he had not had a day time seizure in the past four months (Exhibit 12F). The medical evidence shows that he has had seizures since 1999, three years prior to his alleged date of disability onset (Exhibit 2F). The claimant told his therapist that he was fired from his job because of frequent absences. The mental health records, as discussed above, suggest that his absences may have been related to his depression after his wife's death and his alcohol abuse rather than to his pain. The claimant did not return for treatment after he was evaluated at the mental health center in May 2000 and January 2001. He attended therapy sessions after he lost his job but his psychiatrist, Dr. Gay, suggested that he was motivated by secondary gain (Exhibit 6F). The claimant told a disability examiner that his daily activities included fixing sandwiches and microwave meals, doing laundry and cleaning the house about every other week, driving short distances, going grocery shopping, He said that he was able to handle his own bills and to use his computer to write email and visit chat rooms for about 30 minutes. He said that he remembered his doctors' appointments but occasionally forgot to take his medicine. He said that he socialized with his family and visited his mother every Sunday but did not have many friends. He said that he was okay around one or two other people but did not like crowds. He reported that he drove short distances and did his own grocery shopping. He said that he occasionally felt panicked and shaky in the grocery store and had to leave, but that this did not happen every time he went to the store or was in a crowd (Exhibit 3E). The updated mental health records show that he missed a number of appointments and that Dr. Gay stressed compliance, encouraged the claimant to become more active, and referred him to vocational rehabilitation. Dr. Gay noted that the claimant seemed to be "stuck" while awaiting the outcome of his disability appeal and he encouraged the claimant not be focus 100% of his time and energy in pursuit of disability (Exhibit 13F). Although the claimant has a history of alcohol abuse, drug abuse and alcoholism are not material factors contributing to the determination of disability. He testified that he has not had any alcohol in the past 18 months.

(Tr. 25-26).

In finding the plaintiff's allegations not "fully credible," the ALJ bypassed the threshold question of whether the plaintiff's impairments could reasonably be expected to

cause the symptoms alleged. However, clearly, the objective medical evidence shows the existence of medical impairments that result from anatomical, physiological, or psychological abnormalities and that could reasonably be expected to produce the pain or other symptoms alleged. *See Craig*, 76 F.3d at 595. At the second step, the ALJ considered the intensity and persistence of the plaintiff's subjective symptoms and the extent to which they affect his ability to work and appropriately considered the factors described above in assessing the plaintiff's credibility. Accordingly, directing the ALJ to reconsider upon remand the threshold question of whether the plaintiff's impairments could reasonably be expected to cause the symptoms alleged would serve no purpose.

*Residual Functional Capacity*

The plaintiff next contends that the ALJ failed to properly assess his RFC. Specifically, the plaintiff claims that the ALJ's conclusion that the only limitations he has due to his panic disorder and depression are "limited interaction with large numbers of co-workers or the general public, dealing with things rather than people, and no 'skilled' work" (Tr. 28-29) is not based upon substantial evidence. The plaintiff claims the ALJ should have also included limitations in his ability to do detailed tasks and to maintain concentration in his RFC assessment.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.* . . .

> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, *7 (emphasis added).

The Commissioner argues that the "only mental residual functional capacity assessment in the record indicated Plaintiff had moderate limitations in carrying out detailed instructions, moderate limitations in dealing with the general public, and no significant limitations in all other areas of work-related mental functioning, including concentration" (Tr. 126-28). The plaintiff notes that the Commissioner ignores the most recent non-examining physician opinion, which assessed greater limitations. On June 19, 2003, Renuka R. Harper, Ph.D., completed a Psychiatric Review Technique Form concerning the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Harper found the plaintiff had moderate limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, and no episodes of deterioration of extended duration (Tr. 142-55). Upon remand, the ALJ should be instructed to consider the foregoing evidence in making his function by function assessment of the plaintiff's RFC. Further, in making his RFC assessment, the ALJ should be instructed to consider all of the plaintiff's impairments, even those that are not severe, in combination.

*Hypothetical Question*

The plaintiff next argues that the ALJ's hypothetical question to the vocational expert was insufficient. The ALJ asked the vocational expert to consider a person of the plaintiff's age, education, and work experience who could perform unskilled or semiskilled sedentary and light work with the following limitations: no frequent climbing, balancing, or exposure to unprotected heights; no repetitive reaching above shoulder level with the right

upper extremity; limited interaction with large numbers of co-workers or the general public; and a need to alternate sitting and standing at least once an hour. Ms. Hollenbeck testified that such a person could perform the sedentary, unskilled jobs of surveillance system monitor and ink printer, and the unskilled light jobs of nut-and-bolt assembler and mail clerk (Tr. 377-78).

The plaintiff notes that all but one of the jobs identified by the vocational expert would be precluded by the inability to handle detailed work (pl. brief 30-31). "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). As discussed above, upon remand, the ALJ should consider the evidence that the plaintiff had moderate limitations in concentration and should further consider whether the plaintiff can perform detailed tasks. Further, the ALJ should include all of the plaintiff's impairments in his hypothetical question to the vocational expert.

***Appeals Council***

The plaintiff submitted evidence from Dr. Sam Stone to the Appeals Council. On August 6, 2005, in responses to a questionnaire, Dr. Stone, whom the plaintiff claims is a treating physician, indicated that the plaintiff would have to rest longer than one hour during an eight-hour workday and would be absent from work more than three days per month due to chronic lower back pain, recent pancreatitis, depression, and seizures (Tr. 330). Dr. Stone also indicated that the plaintiff could not engage in sedentary work on a full-time basis (Tr. 330).

In its decision denying the plaintiff's request for review, the Appeals Council stated that it "found that this information does not provide a basis for changing the

Administrative Law Judge's decision" (Tr. 8). The plaintiff contends that the Appeals Council's failure to make specific findings regarding the new evidence is reversible error.

In *Harmon v. Apfel*, 103 F.Supp.2d 869 (D.S.C. 2000), the Honorable David C. Norton, United States District Judge, stated:

> [A]lthough the Appeals Council's decision whether to grant or deny review of an ALJ's decision may be discretionary as well as unreviewable, and the regulations do not require the Appeals Council to articulate a reason for its decision not to grant review, a reviewing court cannot discharge its statutory function of determining whether the findings of the Commissioner are supported by substantial evidence when the Appeals Council considered evidence that the ALJ did not have the opportunity to weigh, and rejected that new, additional evidence without specifying a reason for rejecting it or explicitly indicating the weight given to the evidence.

*Id.* at 874. Based upon the foregoing, upon remand, the ALJ should consider the foregoing evidence, which is in the record (Tr. 330), and "articulate his assessment of the additional evidence presented by Plaintiff, so that this court may determine whether the Commissioner's decision is supported by substantial evidence." *Id.*

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

October 1, 2007

Greenville, South Carolina

20